UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 5:15-cr-00086-LSC-HGD-1 |
| ) | |
| ) | |
| NORBERT VERGEZ, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION AND ORDER ON VICTIM STATUS**

Several persons and corporate entities claiming to be victims of the crimes charged in the above-styled action have moved this Court for leave to appear and be heard at the defendant's sentencing pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"). (Docs. 30 & 31.) For the reasons that follow, the Court finds that they are not victims in this action and their request is due to be denied.

**I.    Background**

On April 20, 2015, Defendant Norbert Vergez ("Vergez") pleaded guilty in this action to three crimes: making false statements to the Department of Defense Office of Inspector General (Count One) and on his government ethics forms (Count Three), both in violation of 18 U.S.C. § 1001; and taking actions constituting a conflict of interest, in violation of 18 U.S.C. § 208 (Count Two).

1

Vergez's commission of these three crimes arose out of his responsibilities while serving as a Colonel in the U.S. Army, specifically responsibilities he undertook associated with sensitive military procurement matters as program manager of the Army's Non-Standard Rotary Wing Aircraft ("NSRWA") component. Vergez lied about critical aspects of his and the NSRWA's relationship with two companies on two occasions: in written documents submitted to the United States Department of Defense Office of Inspector General ("DODIG") and on a government ethics form. In Count One, Vergez lied to DODIG auditors about NSRWA contacts with a third-tier subcontractor. And, while working on government contracts related to another company, Vergez negotiated employment with that company, gave that company favorable treatment, and concealed that arrangement by lying on his government ethics form (Counts Two and Three). More specifically, the stipulated factual basis for Vergez's guilty plea read as follows:

> A.    From in or about January of 2010 through November of 2012, the defendant was a Colonel in the United States Army, serving as the Program manager for a component of the United States Army called Non-Standard Rotary Wing Aircraft (NSRWA). In the course of Vergez's duties at NSRWA, he had program management oversight over cost, schedule and performance of the programs under his purview. Also in the course of his duties, he had frequent contact with representatives of a company called Avia Baltika Aviation, Ltd. (AVB), a Lithuanian firm in the business of

overhauling Mi-17s [helicopters] and providing various other services associated with Mi-17s.

B. When Vergez started working at NSRWA in 2010, AVB was a subcontractor under a Government contract issued to Northrop Grumman Corporation (Northrop) to overhaul Mi-17s. Northrop subcontracted to a company called Flight Test Aerospace (FTA), and FTA subcontracted to AVB.

COUNT ONE - FALSE STATEMENTS TO THE DEPARTMENT OF DEFENSE OFFICE OF INSPECTOR GENERAL

C. In 2012, the Department of Defense Office of Inspector General (DODIG) was conducting an audit of various Mi-17 related contracts, including the Northrop/FTA/AVB Mi-17 overhaul contract described above.

D. One aspect of the audit focused on a series of contract disputes between AVB and Northrop/FTA in the summer of 2010. In the course of those disputes, Vergez and high-level subordinates at NSRWA (with Vergez's knowledge) had numerous and significant direct contacts with AVB related to the AVB subcontract under the Northrop contract.

E. In January of 2012, DODIG prepared a "discussion draft" of an audit report related to that contract. The discussion draft stated that: "NSRWA personnel were communicating directly with AVB/SPARC" and "NSRWA officials' actions caused AVB/SPARC to be under the impression that it could circumvent Northrop Grumman's authority by dealing directly with DoD officials."

F. On or about January 11, 2012, Vergez supervised and directly participated in the preparation of a written response to the discussion draft. That written response represented: "NSRWA PMO had no direct contact with AVB as related to the subcontract with Northrop Grumman." That statement was false because, as

3

Vergez then knew, NSRWA in fact had numerous and significant direct contacts with AVB related to its subcontract with Northrop Grumman.

  G. In about mid-March of 2012, DODIG prepared a "Draft Report," which it provided to Vergez and NSRWA for comment. That Draft Report repeated the same findings as set forth in the discussion draft, *i.e.,* that "NSRWA officials' actions caused AVB/SPARC to be under the impression that it could circumvent Northrop Grumman's authority by dealing directly with DoD officials."

  H. On or about April 30, 2012, the Program Executive Officer (PEO) Aviation, the component of the US Army of which NSRWA was a part, responded to the "Draft Report" by way of a Memorandum. That response "non-concurred" in the Draft Report's recommendations. Among the attachments to that Memorandum was a written response to the Draft Report prepared at Vergez's direction. That written response represented "NSRWA PMO had no direct contact with AVB as related to the subcontract with Northrop Grumman." That statement was false because, as Vergez then knew, NSRWA had, in fact, had significant direct contacts with AVB related to its subcontract with Northrop Grumman.

  I. Another aspect of the DODIG audit was an inquiry into the facts and circumstances associated with the approximately $3.67 million that AVB claimed it was owed under the Northrop contract because of costs AVB claimed to have incurred as a result of the conduct of Northrop and FTA.

  J. On or about December 5, 2011, with Vergez's knowledge and approval, Northrop was given instructions by the contracting officer to make the $3.67 million payment to AVB.

  K. On or about December 6, 2011, a document was prepared at Vergez's direction for Vergez's signature that stated the costs claimed by AVB were reasonable. Vergez never signed that document. That document had a typed date of December 5, 2011.

4

L.	In or about January 2012, DODIG auditors asked USG contracting personnel for documents that supported the December 5, 2011 direction to Northrop to pay AVB the $3.67 million. On or about February 1, 2012, Vergez directed a subordinate civilian employee - Person 1 - to finalize the document referenced in paragraph K and further directed that Person 1 - not Vergez – be the signor of the document.

M.	Person 1 did as directed but retained the typed date of December 5, 2011. On February 1, 2012, Person 1 signed the document and hand-wrote the date "February 1, 2012" next to his/her signature, the day he/she finalized it.

N.	In the late afternoon or early evening of February 1, 2012, Vergez directed Person 1 to remove the hand-written date, so that the document would show only the December 5, 2011 (the typed date). Person 1 did as Vergez directed, and forwarded it by email to Vergez on February 2, 2012. That document was subsequently provided by USG contracting personnel to DODIG auditors. As a result it appeared that Person 1 approved the $3.67 million payment before directions were given to Northrop to make that payment.

COUNT TWO-FELONY CONFLICT OF INTEREST

O.	Person 2 controlled Company A and Company B. Company A, generally, provided management services for Person 2's companies (including Company B). Company B was a helicopter manufacturing company.

P.	On occasion, Company B sold helicopters to foreign governmental entities. Some of those sales were made through a process generally referred to as "foreign military sales," which, in simplified form, involved two contracts: 1) a contract between the foreign government and the USG for the USG to provide the helicopters to the foreign government, and, 2) a contract between the USG and a manufacturer - in this case Company B - for the

company to provide the helicopters to the USG. Vergez, in his capacity as NSRWA Program Manager, had direct involvement with Person 2 in connection with Person 2's attempts to arrange foreign military sales for Company B.

Q. In or around March of 2012, Vergez commenced negotiating for possible future employment with Person 2, directly and through Person 2's representatives (collectively "Person 2"). In April 2012, Person 2 made an offer of employment to Vergez to work for Company B. In May of 2012, Vergez was told by the Army that he could not receive compensation from Company B for a year. Negotiations continued throughout the summer of 2012 as to the prospect that Vergez would work instead for Company A for a year, after which time he would work directly for Company B. In September 2012, Vergez signed an offer of employment at Company A at substantially the same terms as proposed in April of 2012, to commence upon his retirement from the United States Army in 2013. Vergez, in fact, began employment at Company A in or about March of 2013. Vergez commenced directly working at Company B in or about November of 2013.

R. In or about June and July of 2012, Vergez took official acts in matters in which Company B, an entity with which Vergez was negotiating for future employment, had a financial interest, namely:

> 1. In or about late June and early July of 2012, Company B and NSRWA were negotiating a contract. Vergez took acts to cause the payment terms of the contract to be adjusted so that Company B would receive "progress payments" that would result in Company B being paid faster than it would have but for that contract change.

COUNT THREE- FALSE STATEMENTS ON VERGEZ'S GOVERNMENT ETHICS FORM

S. In or about the summer of 2012, the wife of a representative of AVB gave Vergez's wife a Rolex wristwatch valued at approximately $4000.

6

  T. In or about fall of 2012, the defendant reached an agreement with Company A for future employment, to commence in or about March of 2013.

  U. In or about November of 2012, Company A gave the defendant a check for $30,000, the stated reason being that the check was for relocation expenses.

  V. On or about January 2, 2013, in the Northern District of Alabama, Vergez, on a Confidential Financial Disclosure Report (Office of Government Ethics Form 450), certified that all statements he made on the form were ''true, complete, and correct" to the best of his knowledge but he knowingly failed to disclose the following:

   1. All gifts and travel reimbursements greater than $350 for himself or his spouse, when, as Vergez then well knew, his wife had received a Rolex wristwatch from the wife of a representative of AVB in 2012;

   2. All agreements and arrangements for future employment when, as the defendant then and there well knew, he had accepted an offer of employment during 2012 from Person 2 and Company A to work on matters associated with marketing helicopters; and

   3. All sources of salary, fees, commissions and other earned income greater than $200, when, as the defendant then and there well knew, he had received a $30,000 check from Company A during 2012.

(Doc. 2.)

  Prior to Vergez's sentencing on August 25, 2015, this Court received various lengthy submissions from individuals claiming to be victims of Vergez's crimes and requesting to be heard at his sentencing. During Vergez's sentencing, when it

became obvious that certain individuals were present in the courtroom who wished to speak as purported victims, the Court asked the parties to brief, during a recess, the issue of whether those persons present were victims of Vergez's crimes. The Government's brief stated that the victims of Vergez's crimes are the United States Government and the Department of Defense, the United States Army, and DODIG, and that it was not aware of any private individuals who would qualify as victims under the confines of the CVRA. (Doc. 26.) The defense contemporaneously filed a brief agreeing with the Government's filing and adopting it in all respects. (Doc. 27.) When sentencing recommenced, the Court directed any persons who considered themselves victims in this action to file briefs within three weeks, providing argument and evidence in support of their contentions, and further indicated that the Government and the defense could then respond to any briefs submitted within three weeks. Vergez's sentencing was continued to a later date.

On September 15, 2015, Philip Marsteller, Cherie Erickson and Kathy Rupp (hereinafter "the Marsteller group") filed a brief, through counsel, each claiming to be victims of Vergez's conflict of interest crime charged in Count 2 under 18 U.S.C. § 208. (Doc. 30.) The same day, another brief was filed by Defense Technology, Inc. ("DTI"), Cornische Aviation ("Cornische"), and Flight Test

Aerospace, Inc. ("FTA"), also through counsel, also claiming to be victims of all three of Vergez's crimes. (Doc. 31). On September 29, 2015, the Government responded to those briefs (doc. 37), and the defense responded on October 16, 2015 (doc. 41). Both the Government and the defense reiterated their positions that these individuals and corporate entities were not victims of Vergez's crimes as the CVRA defines that term.

## II. Discussion

Federal Rule of Criminal Procedure 32(i)(4)(B) provides that the Court must permit any victim of a crime to be "reasonably heard" at a sentencing hearing. A "victim" is defined by various applicable statutes –the CVRA and 42 U.S.C. § 10607. The CVRA defines the term "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia," 18 U.S.C. § 3771(e), and provides that crime victims have the right, among others, to be reasonably heard at various public hearings, 18 U.S.C. § 3771(a)(4), and the court "shall ensure" that a crime victim is afforded those rights, 18 U.S.C. § 3771(b). In addition, 42 U.S.C. § 10607 provides that the term "victim" means "a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime . . . ." Despite the various

statutes, courts have routinely treated the issue of what it means to be a crime victim uniformly.

To be a victim under the CVRA, the question is whether those who wish to speak are "victims of the criminal conduct as described in the information pending" in this Court. *In re Stewart*, 552 F.3d 1285, 1288 (11th Cir. 2008). The Eleventh Circuit has established a two-part procedure for determining whether an individual is a "crime victim" under the CVRA. First, a court must "identify the behavior constituting 'commission of a Federal offense.'" *Id*. Second, a court must "identify the direct and proximate effects of that behavior on parties other than the United States." *Id*. "If the criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA." *Id*. "Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *Id*. at 1289.

The Sixth Circuit has explained that "[t]he requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analysis." *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010). However, the Fifth Circuit has cautioned that it is not enough for a person to be harmed by the commission of a crime under a "but for" analysis, but the harm that

resulted must also have been "a reasonably foreseeable consequence of the criminal conduct." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011) (denying writ of mandamus seeking that the district court recognize person as crime victim). Moreover, "the harm to the victim [must] be closely related to the conduct inherent to the offense, rather than merely tangentially linked." *McNulty*, 597 F.3d at 352.

In *United States v. Robertson*, 493 F.3d 1322 (11th Cir. 2007), the Eleventh Circuit, in discussing one of the CVRA's sister statutes,[1] also set forth the parameters relevant to the consideration of what harm results from a crime's commission, *i.e.*, what harm is "proximately caused" by that crime:

> We have never defined the phrase "directly and proximately," but we agree with the definitions that our sister circuits have adopted. "[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002) (internal quotation marks omitted). "Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable." *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) (citations omitted); *see also United States v. Donaby*, 349 F.3d 1046, 1054 (7th Cir. 2003) ("victim" under the Restitution Act harmed by "likely and

---

[1] In *Robertson*, the Eleventh Circuit was considering the definition of "victim" under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A ("MVRA"). The definition of "crime victim" in the CVRA is based on the similar definition in the MVRA.

> foreseeable outcome of the crime"). Consistent with these definitions, we have affirmed that damage inflicted during the flight of a bank robber was harm that "directly and proximately" resulted from the commission of the bank robbery. *Washington,* 434 F.3d at 1268–70.

*Id.* at 1334.

### A.    The Marsteller Group

Count Two charged Vergez with a conflict of interest while serving as a Colonel in the U.S. Army: namely, working on government contracts benefitting a helicopter manufacturing company, MD Helicopter, Inc. ("MDHI") (described as "Company B" in the plea agreement), while negotiating future employment with and accepting things of value from that company. All three members of the Marsteller group are former employees of MDHI who claim to have been wrongfully terminated from MDHI. The essence of the Marsteller group's argument that they are victims of Vergez's crime under 18 U.S.C. § 208 is as follows. They start with the premise that Vergez's conduct while a U.S. Army Colonel – taking actions to benefit MDHI in exchange for a bonus check and an offer of employment from Lynn Tilton, the owner of MDHI (described as "Person 2" in the plea agreement) – resulted in the investigation of Vergez, Tilton, and MDHI by the Department of Justice ("DOJ"). They then assert that because they were employed by MDHI at the time of the investigation, they were questioned by the DOJ, which they claim led to their employment being terminated in retaliation

by Tilton, not Vergez. They contend that "if MDHI would not have been associated with Vergez, the Victim's [sic] would never have been privy to the facts underlying Vergez's crimes, and the Victims would never have been punished for providing details of those facts to the government investigators."

The three members of the Marsteller group have commenced wrongful termination litigation against MDHI and are seeking money damages in an attempt to address their respective grievances. Vergez is a named defendant in one of those cases. For instance, Marsteller, along with Robert Swisher, another former employee of MDHI, have been qui tam plaintiffs in the matter of *United States ex rel Phillip Marsteller and Robert Swisher v. Lynn Tilton, Patriarch Partners, LLC, MD Helicopters, Inc. and Norbert Vergez*, No. 5:13-cv-00830-AKK. That suit alleges that MDHI defrauded the Army in connection with its pricing practices. The government declined to intervene in the Marsteller/Swisher qui tam suit on September 15, 2014, and the litigation has proceeded since that time. During that process, Marsteller and Swisher have, through their counsel, filed numerous pleadings, including oppositions to the various motions to dismiss filed by the defendants. Marsteller and his wife have also filed several wrongful termination suits against MDHI, Tilton, and Patriarch Partners (MDHI's parent company and referred to as "Company A" in the plea agreement) in federal and state courts in

Arizona. Additionally, Kathy Rupp and Cherie Erickson have filed suit against Tilton, Patriarch Partners, and MDHI in federal court in Arizona. Indeed, the Marsteller group attaches pleadings, subpoenas and correspondence from these other civil actions to their brief.

The Marsteller group's claim of victim status is similar to that made in *In re McNulty*, 597 F.3d at 344. In that case, McNulty claimed he was terminated for failing to participate in the criminal conduct of his employer. After he was terminated, he contacted the government and provided information used to prosecute his former employer. McNulty requested restitution and asked that he be recognized as a victim "because he refused to participate in the . . . conspiracy and was fired and blackballed in the ice business." *Id.* at 348. The Sixth Circuit rejected his claim, noting that while McNulty may have suffered harms, "they are not criminal in nature." *Id.* at 352. The court noted that his firing, although maybe wrongful, was not closely related to the crimes of conviction and that "[c]ivil, not criminal, remedies are available to redress these actions." *Id.*

Just as in *McNulty,* the members of the Marsteller group cannot satisfy the legal test to be considered "crime victims" of Vergez's 2012 conflict of interest crimes, even assuming all of their wrongful termination allegations are true. Assuming Vergez's conflict of interest crimes were a "but for" cause of the

Marsteller group's terminations by Tilton, because they would not have provided information to the DOJ had Vergez, MDHI, and Tilton not been investigated, Vergez's crimes cannot be considered a proximate cause of their loss. Their complaint is that they were terminated from their employment. According to them, Vergez's only connection to their termination is the tenuous claim that Tilton fired them from MDHI in retaliation for their cooperation in the investigation regarding Vergez. They do not claim that Vergez personally had anything to do with the terminations, or even knew that they were going to occur. Whatever harms the Marsteller group may have suffered, they are not "closely related" to the crimes to which Vergez pled guilty –false statements and conflict of interest. Moreover, there are civil remedies available to the Marsteller group, remedies that they have already sought to access in many different courtrooms.

Finally, the Marsteller group's brief makes a passing reference to 18 U.S.C. § 3661 as a basis for their participation in the sentencing. That statute gives the Court latitude in conducting sentencing hearings, providing that the Court may receive and consider information concerning the "background, character, and conduct" of the person convicted for the purpose of imposing an appropriate sentence. The Court declines to use this statute as a vehicle for unrelated persons to interject new issues into a case at the sentencing stage and finds that, standing

alone, it is not a legitimate basis upon which to permit any of the movants' participation.

### B.    DTI, Cornische, and FTA

For the three corporate entities also claiming victim status, they claim to have lost business as a result of the consolidation of contracting activities for the 21 Mi-17 helicopters for which the NWRWA Program Management Office had some responsibility. DTI is a Huntsville, Alabama based government contractor that overhauls, repairs, and modifies Mi-17 helicopters for use by the Department of Defense. Cornische is a Dubai-based company engaged in the same business. FTA is a Virginia-based company that provides the overhaul, repair and supply of parts for Mi-17 helicopters. The harm that these companies claim to have suffered as a result of Vergez's commission of the offenses of conviction is essentially that they were deprived of the ability to compete for business with the Army on a level playing field, because Vergez had frequent contact with representatives of AVB Aviation Ltd, a Lithuanian firm also in the business of overhauling Mi-17s and providing various other services associated with Mi-17s.

As has the Marsteller group, these companies have already availed themselves of other forums to address their grievances – by pursuing bid protests and filing litigation in the Court of Federal Claims. Indeed, documents relating to

these cases are attached to their brief. For instance, DTI filed a bid protest with the Government Accounting Office ("GAO") on December 31, 2010, after it was not awarded the contract for the Army's procurement of the 21 Mi-17 military helicopters. That bid protest was withdrawn by DTI on January 20, 2011. DTI filed another bid protest with the GAO concerning the Army's solicitation of the 21 military end use Mi-17 aircraft. That protest was dismissed by the GAO after DTI filed suit in the Court of Federal Claims seeking injunctive relief. DTI's Court of Claims lawsuit revealed that DTI felt aggrieved by the fact that although Naval Air Systems Command ("NAVAIR"), an entity that had procured aircraft from DTI in the past, was originally intended to procure the aircraft, the then-Secretary of Defense transferred responsibility for that procurement from the Navy to the Army, and the Army subsequently proposed to source the aircraft from a Russian state-owned enterprise rather than DTI. *See Defense Technology, Inc. v. United States and Richard J. Douglas*, 99 Fed. Cl. 103, 108 (2011). The Court of Claims denied the injunctive relief sought by DTI. *Id.* at 132. There was no allegation made by DTI that Vergez had anything to do with the cancellation of the NAVAIR solicitation, the solicitation by the Army or the decision by the Army to sole source the procurement.

None of the conduct that forms the basis of the crimes to which Vergez pled caused the loss of business opportunity about which DTI, Cornische, or FTA complains. Count One involves the making of a false statement in a DODIG audit. The fact that Vergez made a false statement about his office's contact with a subcontractor regarding the contract is totally unrelated to whether these companies received the contract to supply Mi-17 helicopters. The same is true for Count Two, which charges a conflict of interest. The actions taken by Vergez after he began negotiating for employment with MDHI had nothing to do with the Army's decision with regard to the award of the contract. Whether or not Vergez continued to work on matters affecting MDHI had no effect on these competitors.

A similar argument was presented in *In re Fisher*, 640 F. 3d at 645. In *Fisher,* the petitioner argued "that he was 'denied a level playing field in having his projects fairly considered by the Dallas City Council.'" *Id.* at 649. The Fifth Circuit denied Fisher's petition for mandamus seeking that he be considered a victim. The basis for the court's denial was, in part, that Fisher's claim that but for the criminal conduct he would have competed on a level playing field and thus would have avoided the business losses he suffered, was "too speculative." *Id.* The same is true here. These companies cannot say that, but for the conduct resulting in Vergez's guilty plea, they would have been awarded contracts to supply

aircraft to the Army. The crimes to which Vergez pleaded guilty directly and proximately harmed the United States and its components (*i.e.*, the United States Army), not the movants. Whatever harm the movants may have suffered, they were not "directly and proximately harmed as a result of a Federal offense." 18 U.S.C. § 3771(e).

## III. Conclusion

For the foregoing reasons, the movants –Philip Marsteller, Cherie Erickson, Kathy Rupp, Defense Technology, Inc., Cornische Aviation, and Flight Test Aerospace, Inc. – are not CVRA victims in this action. They will not be permitted to be heard at the defendant's sentencing hearing.

**DONE** AND **ORDERED** ON FEBRUARY 22, 2016.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704